# Exhibit A

THE HONORABLE JOHN C. COUGHENOUR

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| IN RE ZILLOW GROUP, INC. SHAREHOLDER DERIVATIVE LITIGATION | Master File No.: 17-cv-01568-JCC |
| | **VERIFIED CONSOLIDATED** |
| | **SHAREHOLDER DERIVATIVE** |
| | **COMPLAINT** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | **FILED UNDER SEAL** |

### VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Matthew Sciabacucchi and Melvyn Klein ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Zillow Group, Inc. ("Zillow" or the "Company"), submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint").

### NATURE OF THE ACTION

1.      This is a shareholder derivative action for the benefit of nominal defendant Zillow against certain current and/or former members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

2.      Plaintiffs make these allegations upon personal knowledge as to those allegations

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 1-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

concerning Plaintiffs and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by Zillow and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Zillow, defendants (defined herein), and other related non-parties; (c) review of news articles, stockholder communications, and postings on Zillow's website concerning the Company's public statements; (d) review of the pleadings in the federal securities class action captioned *In re Zillow Group, Inc. Securities Litigation*, Case No. 2:17-cv-01387-JCC pending in the U.S. District Court for the Western District of Washington (the "Securities Class Action");[1] (e) review of the pleadings in *Boehler v Zillow*, 14-CV-01844-DOC (N.D. Cal, June 22, 2015)(the "*Boehler* Action"), (f) review of produced documents pursuant to RCW 23B.16.020; and (g) review of other publicly available information concerning Zillow and the defendants.

3.     According to its public filings, Zillow provides e-commerce services. The Company provides information about homes, real estate listings, and mortgages through its website and mobile applications.  Zillow serves homeowners, buyers, sellers, renters, and real estate professionals throughout the United States.

4.     The Company uses a co-marketing program, which permits real estate agents and mortgage lenders with whom it has a working relationship to jointly advertise on Zillow's applications and website (the "Co-Marketing Program").

5.     The Co-Marketing Program, launched in June 2013, allows "Premier Agents" who pay for advertising on Zillow's apps and websites to invite lenders to share marketing costs by paying Zillow to appear as "Premier Lenders" in advertising alongside the agent.

---

[1]     Such a review includes allegations made in the Securities Class Action based on the accounts of two confidential witnesses ("CW1" and "CW2").  Those allegations, as detailed herein, were found sufficient by this Court for pleading purposes.

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 2-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

6.      As part of its business, Zillow is subject to government oversight.  Specifically, Zillow is required to abide by Section 8 of the Real Estate Settlement Procedures Act ("RESPA"), which prohibits kickbacks from real estate settlement services.

7.      RESPA was designed to "eliminat[e] … kickbacks or referral fees that tend to increase unnecessarily the costs of settlement services."  12 U.S.C. § 2601(b)(2). RESPA prohibits "any fee, kickback or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). However, RESPA also states that "[n]othing in this section shall be construed as prohibiting . . . the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. 2607(c)(2).

8.      Enforcement of RESPA was previously assigned to the Department of Housing and Urban Development ("HUD") before being transferred to the Consumer Financial Protection Bureau ("CFPB") in 2011, pursuant to the Consumer Financial Protection Act (the "Protection Act"), passed in 2010. HUD issued an interpretive rule in 2010 finding that payments from home warranty companies to real estate agents for marketing services directed at particular homebuyers constituted payments for referrals. FR Doc. 2010–15317. That is, under the HUD regulations, while it is not illegal for a mortgage servicer such as a home warranty company or a lender to pay for advertising directed at the general public, it is illegal for such a company to pay a real estate agent for a direct recommendation of the mortgage service provider from the real estate agent directly to a prospective buyer. That is because such agents are in a position of trust with respect to the purchaser. Although HUD is no longer the regulator for RESPA, this rule is still in effect.

9.      HUD also stated that RESPA Section 8(c)(2) constitutes a safe harbor for transactions subject to a two-part test.  First, any payments must be compensation for bona fide services performed.  Second, the payments must bear a "reasonable relationship to the value of goods or services actually performed" excluding any referrals.  HUD has guided that "payments

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 3-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

must be commensurate with that amount normally charged for similar services, goods or facilities. This analysis requires careful consideration of fees paid in relation to price structures and practices in similar transactions and in similar markets." RESPA Statements of Policy, 2006 WL 3948236, at *4.

10.     In addition to transferring enforcement authority, the Protection Act made it unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 5531 of this title, or any rule or order issued thereunder, and notwithstanding any provision of this title, the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536. Section 5531 prohibits "a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." Brokers and lenders are covered persons under the statute.

11.     After the CFPB took over enforcement of RESPA, it brought several enforcement actions in 2015 related to the sharing of advertising costs and issuing a compliance bulletin on October 8, 2015, raising concerns about "marketing services agreements" whereby real estate agents enter into contracts with lenders, insurers, or others to share marketing costs. The CFPB did not say such MSAs are inherently illegal under RESPA, but stressed serious skepticism that such agreements are legitimate. The CFPB stated that "many MSAs are designed to evade RESPA's prohibition on the payment and acceptance of kickbacks and referral fees" and that it "received numerous inquiries and whistleblower tips from industry participants describing the harm that can stem from the use of MSAs, but has not received similar input suggesting the use of those agreements benefits either consumers or industry."

12.     In April 2017, Zillow received a Civil Investigative Demand (the "2017 CID") from the CFPB that questioned whether some of Zillow's advertising revenues violated regulations

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 4-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

against kickbacks.

13.     On August 8, 2017, Defendants (defined below) caused the Company to file a Quarterly Report on Form 10-Q with the SEC (the "2Q2017 Form 10-Q"), announcing the Company's financial and operating results for the quarter ended June 30, 2017.  The 2Q2017 Form 10-Q stated in relevant part that the CFPB invited Zillow to discuss a possible settlement and that the CFPB *intends to pursue further action if those discussions do not result in a settlement*.

14.     The 2017 CID was not the first time the CFPB had inquired into the Co-Marketing Plan.  Critically, the 2Q2017 Form 10-Q stated the CID "stemmed from an inquiry that commenced in 2015 when [the Company] received and responded to an initial Civil Investigative Demand from the CFPB" (the "2015 CID").

15.     On this news, the Company's stock price fell by over 15% over the next two trading days, closing at $40.50 on August 10, 2017.

16.     Defendants were first put on notice *over two years ago* via the 2015 CID that the Co-Marketing Program may have violated federal law but took no action to end the Co-Marketing Program or to ensure that it was in compliance with federal law, in violation of their non-exculpable duties of loyalty and good faith.

17.     As a result of this misconduct, the Company and certain individuals were named as defendants in the Securities Class Action.  On April 19, 2019 the Honorable Judge John C. Coughenour ("Judge Coughenour") denied the defendants' motion to dismiss the Securities Class Action in full.

18.     Accordingly, the Company has been damaged.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 5-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1    to confer jurisdiction on a court of the United States which it would not otherwise have.

2        20.    Venue is proper in this district because a substantial portion of the transactions and

3    wrongs complained of herein, including Defendants' primary participation in the wrongful acts

4    detailed herein, occurred in this district.  One or more of the defendants either resides in or

5    maintains executive offices in this district, and defendants have received substantial compensation

6    in this district by engaging in numerous activities and conducting business here, which had an

7    effect in this district.

## THE PARTIES

**Plaintiffs**

8        21.    Plaintiff Sciabacucchi is a current shareholder of Zillow and has continuously held

9    Zillow stock since August 2015.  Plaintiff Sciabacucchi is a citizen of Pennsylvania.

10       22.    Plaintiff Klein is a current shareholder of Zillow and has continuously held stock

11   since February 2014.  Plaintiff Klein is a citizen of New York.

**Nominal Defendant**

12       23.    Nominal Defendant Zillow is a Washington corporation with its headquarters

13   located at 1301 Second Avenue, Seattle, Washington 98101.  According to its public filings,

14   Zillow provides e-commerce services.  The Company provides information about homes, real

15   estate listings, and mortgages through its websites and mobile applications.

**Director Defendants**

16       24.    *Defendant Richard N. Barton* ("Barton") is the Company's co-founder and has

17   served as its Executive Chairman since September 2010.  In addition, Defendant Barton has served

18   as a director of the Company since its inception in December 2004 and previously served as the

19   Company's Chief Executive Officer ("CEO") from inception until September 2010.   Upon

20   information and belief, Defendant Barton is a citizen of Washington.

21       25.    *Defendant Erik C. Blachford* ("Blachford") has served as a director of the

22   Company since 2005.  In addition, Defendant Blachfold served as a member of the Board's Audit

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 6-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Committee (the "Audit Committee") during the Relevant Period. Upon information and belief, Defendant Blachford is a citizen of California.

26. **Defendant Lloyd D. Frink** ("Frink") is a co-founder of the Company and has served as a director since the Company's inception. Defendant Frink is the Vice Chairman of the Board. Upon information and belief, Defendant Frink is a citizen of Washington.

27. **Defendant Jay C. Hoag** ("Hoag") has served as a director of the Company since 2005. Upon information and belief, Defendant Hoag is a citizen of California.

28. **Defendant Gregory B. Maffei** ("Maffei") has served as a director of the Company since 2005. In addition, Defendant Maffei served as the Chairman of the Audit Committee during the Relevant Period. Upon information and belief, Defendant Maffei is a citizen of Colorado.

29. **Defendant Spencer M. Rascoff** ("Rascoff") has served as the Company's CEO since 2010 and a director since 2011. Upon information and belief, Defendant Rascoff is a citizen of Washington.

30. **Defendant Gordon S. Stephenson** ("Stephenson") has served as a director of the Company since 2005. In addition, Defendant Stephenson served as a member of the Audit Committee during the Relevant Period. Upon information and belief, Defendant Stephenson is a citizen of Washington.

31. **Defendant Gregory L. Waldorf** ("Waldorf") served as a director of the Company from February 2015 until June 2016. Upon information and belief, Defendant Waldorf is a citizen of California.

32. **Defendant Kathleen Philips** ("Philips") has served as the Company's Chief Financial Officer ("CFO") since 2015. Upon information and belief, Defendant Philips is a citizen of Washington.

33. Non-party April Underwood ("Underwood") has served as a director of the Company since February 2017.

34. Collectively, Defendants Barton, Blachford, Frink, Hoag, Maffei, Rascoff,

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 7-

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1   Stephenson, Waldorf and Philips shall be referred to herein as "Defendants."

2       35.     Collectively, defendants Maffei, Blachford, and Stephenson shall be referred to

3   herein as the "Audit Committee Defendants."

4       36.     Collectively, Defendants Barton, Blachford, Frink, Hoag, Maffei, Rascoff,

5   Stephenson and Underwood shall be referred to herein as the "Demand Directors."

6                              **DEFENDANTS' DUTIES**

7       37.     By reason of their positions as officers, directors, and/or fiduciaries of Zillow and

8   because of their ability to control the business and corporate affairs of Zillow, Defendants owed

9   Zillow and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and

10  are required to use their utmost ability to control and manage Zillow in a fair, just, honest, and

11  equitable manner.  Defendants were and are required to act in furtherance of the best interests of

12  Zillow and its shareholders so as to benefit all shareholders equally and not in furtherance of their

13  personal interest or benefit.  Each director and officer of the Company owes to Zillow and its

14  shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

15  affairs of the Company and in the use and preservation of its property and assets, and the highest

16  obligations of fair dealing.

17      38.     Defendants, because of their positions of control and authority as directors and/or

18  officers of Zillow, were able to and did, directly and/or indirectly, exercise control over the

19  wrongful acts complained of herein.  Because of their advisory, executive, managerial, and

20  directorial positions with Zillow, each of the Defendants had knowledge of material non-public

21  information regarding the Company.

22      39.     To discharge their duties, the officers and directors of Zillow were required to

23  exercise reasonable and prudent supervision over the management, policies, practices and controls

24  of the Company.  By virtue of such duties, the officers and directors of Zillow were required to,

25  among other things:

26  VERIFIED CONSOLIDATED SHAREHOLDER
    DERIVATIVE COMPLAINT
    (FILED UNDER SEAL) - 8-

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

40.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required to assist the Board in oversight of: (a) the Company's accounting and financial reporting processes and the audits of the Company's financial statements, (b) the independent auditor's qualifications, independence and performance, (c) the Company's internal audit function, if any, and the performance of its internal accounting and financial controls, and (d) the Company's compliance with legal and regulatory requirements.

41.     The Audit Committee is further charged with reviewing legal and regulatory matters that may have a material impact on the Company's financial statements and related Company compliance policies and programs, and to discuss policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

## SUBSTANTIVE ALLEGATIONS

### A.     Background of the Company

42.     According to its public filings, Zillow provides e-commerce services. The Company provides information about homes, real estate listings, and mortgages through its website and mobile applications.  Zillow serves homeowners, buyers, sellers, renters, and real

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 9-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

estate professionals throughout the United States.

43.     Zillow operates the "leading real estate and home related information marketplaces on mobile and the web" through the brands Zillow, Trulia, StreetEasy, HotPads, and Naked Apartments. Zillow sells advertising on these websites to real estate agents and mortgage professionals.

44.     Zillow's primary source of revenue is selling advertising to real estate professionals, and its largest customer base is real estate agents. Agents pay to list properties on Zillow's various platforms with their name attached to the listing, and prospective buyers can provide their contact information and ask to be contacted by an agent, providing the agent with a lead. The listing also provides a form for the prospective buyer to provide their contact information.

45.     Real estate agents are primarily interested in advertising on Zillow for the purpose of obtaining leads. However, Zillow does not charge per lead.  Zillow, instead, charges per impression, that is, an advertiser pays each time a customer views a listing, whether or not the customer chooses to submit their information to the agent. However, agents are more concerned with leads, as they are not so much concerned with how many prospective customers view their listings, but with how many of those customers submit their contact information on the website via the designated form.

46.     The Co-Marketing Program, launched in June 2013, allows "Premier Agents," who pay for advertising on Zillow's apps and websites, to invite lenders to share marketing costs by paying Zillow to appear as "Premier Lenders" in advertising alongside the agent.

47.     Premier Agents are real estate agents who purchase a specific advertising package for their advertisements to be placed along potential clients looking for real estate in their respective zip codes.  According to Zillow's website:

> By advertising on Zillow, you receive more than just placement on one of the leading real estate sites on the Web.  Your advertising extends beyond our millions of monthly active home shoppers, to placement on Yahoo! Real Estate as well as

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 10-

across our top-rated mobile apps. Receive instant visibility for your brand and your listings on the largest real estate network on the Web

*   *   *

The Zillow Premier Agent program is designed with the simple purpose of bringing agents more buyers, more sellers, and more business. Each service tier is loaded with innovative and powerful features aimed to generate more traffic to your brand and your listings -- helping you sell homes faster. With three tiers of service, there's a Premier Agent package that's right for you.

48.    The Premier Agent program has been a financial boon for the Company.  According to the Company's third quarter 2017 investor presentation, the Premier Agent program accounts for 71% of the Company's revenues:




49.    The Company's Co-Marketing Program allows Premier Agents to offset their marketing costs by partnering with lenders, so that lenders' advertisements will appear in tandem with the Premier Agent.  The Company's website explains:

From the Lender Co-marketing dashboard, a Premier Agent® can invite a lender to share marketing costs with them. The agent specifies the dollar amount they would like each lender to contribute.  An agent can have up to 50 percent of their marketing costs covered by their lender(s).  Once the lender confirms, they will immediately start appearing alongside the agent on Zillow.

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 11-

BADGLEY MULLINS TURNER PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

50.     In exchange for paying a portion of the advertising costs, the mortgage lender appears at the bottom of the real estate agent's ad as that agent's "preferred lender."  The ad has a form for the customer to submit their contact information to the agent and includes a "check box" that states "I want to be preapproved."  The box is checked by default, and if that box is not unchecked, the contact information provided to the agent is also provided to the lender. If the prospective buyer unchecks the box, the real estate agent is notified, so that the real estate agent can forward the contact information to the lender.

51.     Under RESPA, it is illegal for a lender to pay a real estate agent for referrals or leads. In addition, under the Protection Act, it is illegal to provide "substantial assistance" to another person or entity's violation of consumer protection acts, including RESPA.

52.     By bringing the co-marketing concept online, Zillow allowed lenders to appear alongside the real estate agent advertisements, in exchange for the lender making a fixed monthly payment to Zillow, which defrays a fixed percentage of the agent's monthly ad spend. Zillow also forwarded the agents' customer leads to the lenders, although a customer who inputs their information could opt out of having their lead provided to a lender by unchecking the box titled, "I would like to receive financing information."

53.     Longstanding HUD regulations make clear that under RESPA, it is illegal for a lender to pay a real estate agent in exchange for that agent making any sort of personal recommendation of that lender.  However, RESPA contains a safe harbor provision that states that its ban on payments for referrals is inapplicable to fair market value payments for legitimate services.

54.     Because Zillow is the market leader in online real estate advertising, Defendants had the ability to ensure that the Company's Co-Marketing Program was compliant by requiring that lenders participating in the program pay fair market value for the advertising they purchased.

55.     Instead, under Defendants' direction, Zillow (a) charged lenders far in excess of the fair market value of those services; and (b) actively monitored and encouraged lenders and agents

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 12-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

to violate RESPA, contacting agents to make sure they are making referrals. Thus, although the only lawful service the Co-Marketing Program can provide is the sharing of advertising space, Defendants designed the program with the understanding that agents would nonetheless use it to violate RESPA by making illegal referrals to lenders. Thus, the Co-Marketing Program does not work unless everyone involved violates the law.

56.     As a result of the Company's RESPA violations, the CFPB launched an investigation into Zillow, centered around the Co-Marketing Program, in April 2015. Defendants did not disclose this investigation to investors until May of 2017, after receiving a "notice and opportunity to respond and advise" letter, notifying Zillow of the CFPB's specific concerns regarding the Co-Marketing Program was illegal.  Even then, Defendants downplayed the seriousness of the situation, falsely reassuring investors that the program, which was in fact an enormous contributor to Zillow's bottom line, was "small" and falsely claiming that they were still confident that their program was compliant, when in reality Defendants changed the Co-Marketing Program to comply with RESPA in the beginning of 2017 in response to CFPB warnings.

57.     On August 8, 2017, Defendants were forced to admit the seriousness of the Company's legal jeopardy, acknowledging that the Company had been notified by the CFPB that it intended to charge Zillow with RESPA violations if it did not reach a settlement. Following this news, Zillow's share price fell $7.43, or 15.5%, over the following two trading days to close at $40.50 on August 10, 2017.

58.     On June 25, 2018, the Company issued a Form 8-K with the SEC announcing that the Company received a letter from the CFPB on June 22, 2018, stating that the CFPB concluded its investigation of Zillow and that it did not intend to take enforcement action.

**B.     Zillow's Co-Marketing Program Does Not Fall Within the RESPA Safe Harbor**

59.     Zillow's Co-Marketing Program does not fall under the RESPA safe harbor because it permitted lenders to pay a greater share of the marketing budget than is justified by the number of leads provided by the program.  Because a lender only receives 4 leads for every 10 received

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 13-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

by the broker, if a single lender paid 50% of the agent's advertising cost, the lender is paying 2.5 times more per lead than the agent does. If, as was permitted under the program, five lenders in total contributed 18% each to the agent's monthly budget, for a total of 90% of that budget, they would be paying 22.5 times more per lead than the agent.

60.     Lenders were also able to evade the 50% cap on their payments to agents that was in place.  According to the Consolidated Complaint in the *Boehler* Action, James Friedrich ("Friedrich"), an inside sales consultant discovered a violation of RESPA Section 8 by a lender using the Co-Marketing Program on October 23, 2013.  Specifically, Friedrich discovered that a single lender's credit card was being used to pay more than 50% of the cost of an agent's advertising in the Co-Marketing Program.  Emails exchanged in discovery in that action and subsequently filed in court reveal that this was achieved by billing both the lender and agent's portion of co-marketing costs to one credit card – that of the lender. Friedrich called a meeting with his manager on October 28, 2013 and explained this and other legal violations he discovered. He received assurances that this would be addressed, but after several weeks he noticed the problems had not been fixed. Friedrich informed his manager of this repeatedly, and eventually the manager became angry and told Friedrich to drop it.

61.     On November 3, 2013, Ashley Boehler, another inside sales representative who Friedrich discussed the issue with, sent an email from an anonymous account to several Zillow Executives, including Rascoff, outlining the misconduct discussed in the previous paragraph.  That email identified four separate instances where a single credit card was supplied both for an agent and a co-marketing lender.   Boehler also directly approached Zillow's upper management, revealing his identity, and reiterating his concerns.  Boehler was assured by Zillow's then-CFO Chad Cohen that his anonymity would be protected.  However, both Boehler and Friedrich were fired shortly after identifying Zillow's RESPA violations.

62.     As alleged in the Securities Class Action, CW2 reports that similar misconduct to that identified by Friedrich continued at Zillow during the relevant period.  They explained that

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 14-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

while Zillow's official policy forbade any lender from paying more than 50% of an agent's advertising costs, it was nonetheless possible for a lender to make a payment of up to 90% of co-marketing costs through the Zillow website.  CW2 explained that they spent two years "training reps to tell agents that lenders should not pay more than 50%, but of course, the [Zillow] sales people would tell the agents that the lender could pay up to 90%."  Throughout their tenure at Zillow, CW2 recalls hearing Zillow sales representatives telling real estate agents that lenders could pay up to 90% before calls began recording.  When CW2 questioned Zillow's practice of having sales representatives instruct agents to violate RESPA, their superiors told them that the Company has "bigger issues to deal with."  Every time they asked Zillow management questions about the Co-Marketing Program, they were "reminded to not ask questions."

63.   Although Defendants have consistently claimed that the Co-Marketing Program's contribution to Zillow's revenue is small, this is inaccurate.  The Co-Marketing Program, according to both Susquehanna International Group ("Susquehanna") and PAA Research, accounts for approximately 10% of Zillow's revenues.  According to Susquehanna, revenues from co-marketing are highly profitable, with EBITDA margins of 50- 80%.  That is, the costs of the Co-Marketing Program are quite low, so the revenues are highly profitable.  Therefore, Patel estimated that a loss of the Co-Marketing Program could lead to a 20-50% decline in Zillow's EBITDA.

**Zillow's Co-Marketing Program Violated the Protection Act's Prohibition on Providing Substantial Assistance to Abusive Acts in Connection with Consumer Financial Transactions**

64.   The Protection Act provides the CFPB with the authority to take action to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. § 5531(a).  Abusive practices are those that, among other things, take "unreasonable

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

advantage of … the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." *Id.* §5531 (d).  Real estate agents and lenders are covered persons, and, as set forth in a HUD 2010 interpretive rule, RESPA's Section 8 exists precisely because "a real estate broker and agent hold positions of influence in the real estate transaction."   Therefore, "a homebuyer or seller is more likely to accept the broker's or agent's promotion or recommendation of a settlement service provider."  Section 1 of RESPA states that RESPA is needed to protect home buyers from "certain abusive practices that have developed in some areas of the country" and that the purpose of RESPA is to eliminate practices such as "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. §2601. Therefore, violations of RESPA Section 8 for improper referrals are also violations of Section 5531 of the Protection Act.

65.     It is a violation of Protection Act Section 5536 to knowingly or recklessly provides substantial assistance to a violator of Section 5531.  Zillow substantially assisted lenders and agents who violated RESPA Section 8, and therefore Protection Act Section 5531, by making illegal payments for referrals through the Co-Marketing Program.  Defendants were aware of or reckless towards the program because Zillow actively tracked the number of referrals premiere agents provided to lenders.  Defendants were also aware that the Co-Marketing Program was not subject to the safe harbor because it had data that showed that agents paid far in excess of reasonable market rates for co-marketing advertising.

**The CFPB Steps Up Regulatory Enforcement and Targets Zillow**

66.     In 2015, the CFPB dramatically stepped up RESPA enforcement, entering into several enforcement actions and consent orders with various players in the real estate industry. For instance, the CFPB entered into a consent order with Wells Fargo and JP Morgan Chase for a total of $35.7 million in fines and redress to consumers, in response to those two banks steering business to Genuine Title, a defunct title company, in exchange for Genuine Title purchasing, analyzing, and providing data on customers, and creating letters with the banks' logos that Genuine Title then

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 16-

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

mailed to prospective borrowers. It reached a settlement for $2 million with New Day Financial for using deceptive advertising and paying kickbacks to a veteran's organization in exchange for referrals.  At the same time, the CFPB issued a decision on June 4, 2015, levying a $109 million disgorgement order against PHH Corporation, a title insurance company, finding that it illegally referred customers to mortgage insurers in exchange for kickbacks.

67.    Defendants were keenly aware of the CFPB's heightened enforcement efforts.  As a result of this stepped up regulatory activity, an analyst on a November 3, 2015 investor call asked Defendants Rascoff and Phillips "can you just give us a sense for how much the mortgage co-advertising is contributing to agent revenue?  And kind of where penetration is?  Where you think it can go?  And is the RESPA or CFPB kind of investigations into this is – is this something that should be a concern?  Or something that you think is not really an issue?"  Phillips responded by stating "on your questions about co-marketing, co-marketing with lenders and agents is a very small part of our business, a small contributor to average revenue per account ("ARPA") revenue. Importantly though, we are not seeing lenders depart from this program notwithstanding all the discussions in the marketplace about the CFPB and the CFPB's recent pronouncements and actions. I can assure you that we work diligently to comply with all of the rules put forth by government agencies and of course, we monitor the CFPB and the things that they are saying and doing to make sure that we remain in compliance and to make sure that we understand how their activities relate to our business."

68.    In the beginning of 2017, in response to the CFPB's inquiries, Defendants substantially altered the Co-Marketing Program. Instead of allowing lenders to collectively contribute up to 90% of an agent's advertising spend, Zillow restricted lenders to 50% of that spend.  However, Defendants concealed this change from the public and did not alter Zillow's website to reflect the change for several months.  As alleged in the Securities Class Action by CW1, in the beginning of 2017 CW1 and other sales representatives were instructed to explain to agents that Zillow was capping total lender contributions at 50% of total advertising costs.  Their

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 17-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

understanding was that this change was in response to a government investigation. CW1 noted that because this decrease in the maximum amount a lender could pay to an agent for co-marketing costs was not reflected on Zillow's website, it was difficult to explain to customers because the information on that website was different than what CW1 was providing to agents.  In addition, analysts discussing Zillow's Co-Marketing Program were unaware of the change, describing the old version of the Co-Marketing Program in their reports. For instance, the prominent real estate website The Real Deal described the outdated program on August 18, 2017 in an article titled "'Co-marketing' arrangements put Zillow in hot water."  Housingwire.com, another prominent real estate industry publication, referred to Zillow's 90% limit on September 13, 2017, not noting that this was an out of date version of the program.

69.    Zillow received a Notice and Opportunity to Respond ("NORA") letter from the CFPB in February of 2017, stating that the CFPB Office of Enforcement was considering whether to recommend that the CFPB take legal action against Zillow for violation of Section 8 of RESPA, and Section 1036 of the Protection Act.  Zillow responded in March of 2017 and in April of 2017 Zillow received an additional CID.  Finally, in August 2017 the CFPB informed Zillow that it had concluded its investigation, invited Zillow to discuss a possible settlement, and that it intended to pursue an action against Zillow if a settlement was not reached.

70.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

71.    ████████████████████████████████████████████████████████

72.    On October 31, 2017, at a regular meeting of the Audit Committee, ████████

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 18-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1 ████████████████████████████████████████████

2 ████████████████████████████████████████

3 ██████████████████

4 73. ████████████████████████████████████████

5 ████████████████████████████

**C.      Materially False and Misleading Statements During the Relevant Period**

74.     The Co-Marketing Program, among other aspects of the Company's business, brings the Company within the purview of government regulation.  Specifically, among other laws, the Company is subject to RESPA.

75.     Section 8 of RESPA states:

> (a)      No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

> (b)      No person shall give, and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

76.     The Relevant Period begins on November 17, 2014, when Zillow's Initial Registration Statement became effective. The Initial Registration Statement was signed by Defendants Rascoff and Phillips.

77.     The Initial Registration Statement incorporated by reference Zillow, Inc.'s annual report for the year ending December 31, 2013 filed on Form 10-K with the SEC on February 18, 2014 (the "2013 10-K").   The 2013 10-K, and therefore by reference the Initial Registration Statement, stated the following regarding the Company's adherence to government regulations:

**Government Regulation**

[T]he real estate agents, mortgage brokers, banks, property managers, rental agents

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 19-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages.  While we do not believe that we are currently subject to these regulations, we intend to ensure that any content created by Zillow is consistent with them by obtaining assurances of compliance from our advertisers and customers for their activities through, and the content they provide on, our mobile applications and websites.  Since the laws and regulations governing real estate, rentals and mortgages are constantly evolving, it is possible that some part of our business activities could fall within the scope of regulation or be prohibited altogether at some point in the future.

78.    The Initial Registration Statement also included the merger agreement between Zillow, Inc. and Trulia. This included a section entitled "Representations and Warranties of Zillow."  It stated that "[n]either Zillow nor any Zillow Subsidiary is in conflict with, or in default, breach or violation of, (a) any Law applicable to Zillow or any Zillow Subsidiary…."

79.    On February 17, 2015, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC, announcing its financial and operating results for the quarter and year ended December 31, 2014 ("2014 10-K").  The 2014 10-K was signed by Defendant Rascoff.

80.    The 2014 10-K stated the following regarding the Company's adherence to government regulations:

[T]he real estate agents, mortgage brokers, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages. We endeavor to ensure that any content created by Zillow is consistent with such laws and regulations by obtaining assurances of compliance from our advertisers and consumers for their activities through, and the content they provide on, our mobile applications and websites. Since the laws and regulations governing real estate, rentals and mortgages are constantly evolving, it is possible that some part of our business activities could fall within the scope of regulation or be prohibited altogether at some point in the future.

81.    On February 17, 2015, Defendants caused the Company to file a Form S-8 Registration Statement with the SEC (the "February 2015 S-8"), which registered securities offered to employees pursuant to the amended and restated incentive plan dating to 2011 (the "2011 Incentive Plan").  The February 2015 S-8 was signed by Defendant Rascoff.

82.    On April 1, 2015, Defendants caused the Company to file a Form S-3 Post-Effective

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 20-

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Amendment to the Initial Registration Statement with the SEC (the "Form S-3"). The Form S-3 was signed by Defendant Rascoff. The Form S-3 registered 124,716 shares of Class A Common Stock.

83.     On August 17, 2015, Defendants caused the Company to file a Form S-8 Registration Statement with the SEC (the "August 17, 2015 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan. The August 17, 2015 S-8 was signed by Defendants Rascoff and Phillips.

84.     On August 21, 2015, Defendants caused the Company to file a Form S-8 Registration Statement with the SEC (the "August 21, 2015 S-8"), which amended and restated the 2011 Incentive Plan by amending the securities to be offered to employees in employee benefit plans. The August 21, 2015 S-8 was signed by Defendants Rascoff and Phillips.

85.     On November 3, 2015, on a call with investors, an analyst asked "can you just give us a sense for how much the mortgage co-advertising is contributing to agent revenue? And kind of where penetration is? Where you think it can go? And is the RESPA or CFPB kind of investigations into this is – is this something that should be a concern? Or something that you think is not really an issue?" Phillips responded by stating that "co-marketing with lenders and agents is a very small part of our business, a small contributor to ARPA revenue. Importantly though, we are not seeing lenders depart from this program notwithstanding all the discussions in the marketplace about the CFPB and the CFPB's recent pronouncements and actions. I can assure you that we work diligently to comply with all of the rules put forth by government agencies and of course, we monitor the CFPB and the things that they are saying and doing to make sure that we remain in compliance and to make sure that we understand how their activities relate to our business."

86.     On February 12, 2016, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 21-

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Defendants Rascoff, Philips, Barton, Frink, Blachford, Flint, Hoag, Maffei, Stephenson, and Waldorf.

87.     In addition, pursuant to the Sarbanes-Oxley Act of 2002, the 2015 10-K contained signed certifications ("SOX Certifications") by Defendants Rascoff and Philips, stating that the financial information contained in the 2015 10-K was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.  The SOX Certifications set forth, in pertinent part:

I, [Spencer M. Rascoff/Kathleen Philips], certify that:

1.      I have reviewed this Annual Report on Form 10-K of Zillow Group, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 22-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*   \*   \*

In connection with the Annual Report of Zillow Group, Inc. (the "Company") on Form 10-K for the fiscal year ended December 31, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, [Spencer M. Rascoff, Chief Executive Officer of the Company/Kathleen Philips, Chief Financial Officer, Chief Legal Officer, and Secretary of the Company], certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

88.     Further, in the 2015 10-K, Defendants stated the following regarding the Company's purported adherence to government regulations:

**Government Regulation**

We are affected by laws and regulations that apply to businesses in general, as well as to businesses operating on the Internet and through mobile applications. This includes a continually expanding and evolving range of laws, regulations and standards that address information security, data protection, privacy, consent and advertising, among other things.  We are also subject to laws governing marketing and advertising activities conducted by telephone, email, mobile devices, and the

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 23-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Internet, including the Telephone Consumer Protect Act, the Telemarketing Sales Rule, the CAN-SPAM Act, and similar state laws. In addition, some of our mortgage advertising products are operated by our wholly owned subsidiary, Zillow Group Mortgages, Inc., a licensed mortgage broker, pursuant to a support services agreement. Though we do not take mortgage applications or make loans or credit decisions in connection with loans, Zillow Group Mortgages, Inc. is subject to stringent state and federal laws and regulations and to the scrutiny of state and federal government agencies as a licensed mortgage broker.

By providing a medium through which users can post content and communicate with one another, we may also be subject to laws governing intellectual property ownership, obscenity, libel, and privacy, among other issues. In addition, the real estate agents, mortgage professionals, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages. We endeavor to ensure that any content created by Zillow is consistent with such laws and regulations by obtaining assurances of compliance from our advertisers and consumers for their activities through, and the content they provide on, our mobile applications and websites. The real estate, mortgages, and rentals industries are subject to significant state and federal regulation; though we provide advertising services and technology solutions to real estate, mortgages, and rentals professionals, certain of our activities may be deemed to be covered by these industry regulations. Since the laws and regulations governing real estate, rentals and mortgages are constantly evolving, it is possible that we may have to materially alter the way we conduct some parts of our business activities or be prohibited from conducting such activities altogether at some point in the future.

89.    On March 4, 2016, Defendants caused the Company to file a Form S-8 Registration Statement with the SEC (the "March 2016 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan.  The March 2016 S-8 was signed by Defendants Rascoff and Phillips.

90.    On August 5, 2016, Defendants caused the Company to file a Form S-8 Registration Statement with the SEC (the "August 2016 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan.  The August 2016 S-8 was signed by Defendants Rascoff, Phillips, Barton, Frink, Blachford, Flint, Hoag, Maffei, and Stephenson.

91.    On February 2, 2017, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2016 ("2016 10-K"). The 2016 10-K was signed by Defendants Rascoff and Phillips.

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 24-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

92.     The 2016 10-K contained SOX Certifications, signed by defendants Rascoff and Philips, which were substantially similar to those set forth in above, and a statement regarding the Company's purported adherence to government regulation that was identical to that set forth above.

93.     During a conference call with analysts that same day, Defendant Phillips provided further detail, stating that the CFPB has been reviewing the Co-Marketing Program for compliance with RESPA, that the CFPB provided more information, and that "we believe our co-marketing program has, and continues to, allow agents and lenders to comply with the law while using our product."  An analyst on that call asked about the amount of business done through comarketing type arrangements, and whether there had been any changes in behavior by agents or lenders given the CFPB's actions.  "On the CFPB, we don't break out the amount of the revenue that comes from co-marketing efforts, but we have said, and it continues to be the case that it's a small portion of overall revenue.  In terms of changes in behavior, we haven't observed anything specific, but I can tell you that real estate agents and lenders are pretty keenly aware of the restrictions that are placed upon their co-marketing efforts through RESPA and other regulatory regimes.  So, they are intent on complying and pay close attention to their own behavior, monitoring themselves.  We think though the way that we have put this product together enabled agents and lenders to participate in full compliance with the law."

94.     On February 10, 2017, Defendants caused the Company to file a Form S-8 Registration Statement with the SEC (the "February 2017 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan.  The February 2017 S-8 was signed by Defendants Rascoff and Phillips.

95.     On May 24, 2017, Defendant Rascoff appeared on the internet-based television channel Cheddar.com and stated "two years ago the CFPB started asking us questions about this [the Co-Marketing Program] and we've been talking with them literally for two years. We think the way we've constructed the program is completely compliant and allows agents and lenders to

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 25-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

stay within the confines of the laws that govern this, but we're still talking to the CFPB about it so we'll see.  We haven't disclosed the amount of revenue, we've said it's small, but we haven't disclosed it, and, you know, it's an ongoing conversation."  Rascoff was then asked "if it's a case where you had to alter the co-marketing program how much of an impact would it be on the company."  Rascoff responded that ". . . it's really hard to speculate hypothetically because we have no idea whether this ends up being blessed or not. It could have no impact or it could have an impact."

96.     The foregoing statements were misleading for failing to disclose that Zillow's Co-Marketing Program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations.  Zillow's Co-Marketing Program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services. The Co-Marketing Program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA.  The foregoing statements were also misleading for failing to disclose that the CFPB had issued a CID attempting to determine whether the co-marketing program violated RESPA.  In addition, the statement "the way we've constructed the program is completely compliant" is misleading because, in reality, Zillow had already altered the Co-Marketing Program in an attempt to remedy RESPA violations identified by the CFPB.  The statement ". . . it's really hard to speculate hypothetically because we have no idea whether [the Co-Marketing Program] ends up being blessed or not" is misleading for failing to disclose that Zillow had already altered the Co-Marketing Program in an attempt to remedy RESPA violations identified by the CFPB. The foregoing statement was further misleading for failing to disclose that Zillow violated the Protection Act by providing substantial assistance to brokers and lenders who violated RESPA.

D.     **The Truth Emerges**

97.     On May 4, 2017, Defendants caused the Company to file a Quarterly Report on

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 26-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Form 10-Q with the SEC (the "1Q2017 Form 10-Q"), announcing the Company's financial and operating results for the quarter ended March 31, 2017.  The 1Q2017 Form 10-Q also disclosed that the Company had received the 2017 CID from the CFPB questioning whether some of Zillow's advertising revenues violated regulations against kickbacks.  Defendants also disclosed that it received a NORA letter from the CFPB in February of 2017, stating that the CFPB Office of Enforcement was considering whether to recommend that the CFPB take legal action against Zillow for violation of Section 8 of RESPA, and Section 1036 of the Protection Act, that Zillow responded on March of 2017, and that in April of 2017 Zillow received an additional CID.

98.     During a conference call that same day with investors, Defendant Phillips provided further detail, stating that the CFPB has been reviewing the Co-Marketing Program for compliance with RESPA, that the CFPB provided more information, and that "we believe our co-marketing program has, and continues to, allow agents and lenders to comply with the law while using our product."  An analyst on that call asked about the amount of business done through comarketing type arrangements, and whether there had been any changes in behavior by agents or lenders given the CFPB's actions.  "On the CFPB, we don't break out the amount of the revenue that comes from co-marketing efforts, but we have said and it continues to be the case that it's a small portion of overall revenue. In terms of changes in behavior, we haven't observed anything specific, but I can tell you that real estate agents and lenders are pretty keenly aware of the restrictions that are placed upon their co-marketing efforts through RESPA and other regulatory regimes.  So, they are intent on complying and pay close attention to their own behavior, monitoring themselves.  We think though the way that we have put this product together enabled agents and lenders to participate in full compliance with the law."  Because of Phillips' false assurance that the comarketing program accounted for a "small" amount of revenue, that no changes had been made and that its co-marketing program currently and, in the past, complied with the law, the market did not react to the revelation of the investigation.

99.     The market instead learned the true scope of the Co-Marketing Program on May

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

17, 2017 when Shyim Patil ("Patil"), of Susquehanna, released a sensitivity analysis of the potential for an adverse CFPB ruling to negatively impact Zillow's revenue and income.  That research indicated that in excess of 10% of Zillow's revenue was exposed to illegal co-marketing, and that revenues from co-marketing are highly profitable, with EBITDA margins of 50- 80%, as compared to the rest of Zillow's business, which operated at a loss throughout the Relevant Period. That is, the costs of the Co-Marketing Program are quite low, so the revenues are highly profitable. Therefore, Defendant Patel estimated that a loss of the Co-Marketing Program could lead to a 20- 50% decline in Zillow's 2018 EBITDA.  This corrected Defendants' previously made false statements that the Co-Marketing Program was small and therefore did not pose any threat to Zillow's revenue, income or business prospects.

100.    On this news, Zillow's Class A share price dropped $2.46 to $41.64, a drop of 6.24%. Zillow's Class C share price dropped $3.02 to $41.37, a drop of 6.80%. Susquehanna's report received widespread coverage, with articles summarizing those findings on www.seekingalpha.com and www.streetinsider.com.

101.    On August 8, 2017, Defendants caused the Company to file the 2Q2017 Form 10-Q, announcing the Company's financial and operating results for the quarter ended June 30, 2017. The 2Q2017 Form 10-Q stated, in relevant part:

> In April 2017, we received a Civil Investigative Demand from the Consumer Financial Protection Bureau ("CFPB") requesting information related to our March 2017 response to the CFPB's February 2017 Notice and Opportunity to Respond and Advise ("NORA") letter. The NORA letter notified us that the CFPB's Office of Enforcement was considering whether to recommend that the CFPB take legal action against us, alleging that we violated Section 8 of the Real Estate Settlement Procedures Act ("RESPA") and Section 1036 of the Consumer Financial Protection Act ("CFPA"). ***This notice stemmed from an inquiry that commenced in 2015 when we received and responded to an initial Civil Investigative Demand from the CFPB.*** We continue to cooperate with the CFPB in connection with requests for information. Based on correspondence from the CFPB in August 2017, we understand that it has concluded its investigation. The CFPB has invited us to discuss a possible settlement and indicated that it intends to pursue further action if those discussions do not result in a settlement. We continue to believe that our acts and practices are lawful and that our comarketing program allows lenders and agents to comply with RESPA, and we will vigorously defend against any allegations to the contrary.  Should the CFPB commence an action against us, it

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 28-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

may seek restitution, disgorgement, civil monetary penalties, injunctive relief or other corrective action. We cannot provide assurance that the CFPB will not commence a legal action against us in this matter, nor are we able to predict the likely outcome of any such action. We have not recorded an accrual related to this matter as of June 30, 2017 or December 31, 2016. ***There is a reasonable possibility that a loss may be incurred; however, the possible loss or range of loss is not estimable.*** [Emphasis added].

102.    On August 8, 2017, an earnings conference call was held with analysts, during which Defendant Philips stated in relevant part:

On our last earnings call, we shared that the Consumer Financial Protection Bureau had requested additional information from us as part of its evaluation. That evaluation is now complete. We have been invited to discuss a possible settlement and informed that ***if those discussions do not result in a settlement, the CFPB intends to pursue further action***. [Emphasis added].

103.    Patil later wrote on August 8, 2017 that he believes the Co-Marketing Program accounts for as much as 10% of the Company's revenues. Patil further suggested that "[c]onduct based remedies" as part of a settlement with the CFPB, and not a fine, "represent the biggest risk to the [C]ompany."

104.    Defendants commenced settlement negotiations with the CFPB almost immediately. Defendants Philips told analysts on the same August 8, 2017 conference call:

Things are -- we expect things are going to move pretty quickly with the CFPB. We're going to be commencing settlement discussions over the next few weeks. In fact, I'm headed to D.C. for the first meeting tomorrow. So, we anticipate that to be a pretty fast process. If we are not able to reach a settlement, this turns into a regular litigation matter in federal court with discovery, procedural motions and the like, which, as you well know, can take quite a bit of time. But the CFPB settlement portion, we don't anticipate that to be very long or drawn out.

105.    Following this news, Zillow's Class A share price fell by $7.49, or 15.7%, over the following two trading days to close at $40.25 on August 10, 2017. Zillow's Class C share price fell $7.43, or 15.5%, on the following two trading days to close at $40.50 on August 10, 2017.

106.    As a result of Defendants' breaches of fiduciary duty and other serious misconduct, the Company has been harmed and faces the risk of future damage.

**E.    The Securities Class Action**

107.    As a result of the above alleged conduct, the Company was named as a defendant

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 29-

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

in the Securities Class Action on November 18, 2018.  The Securities Class Action also names Rascoff and Phillips as individual defendants.

108.    On April 19, 2019, Judge Coughenour denied the defendants' motion to dismiss the Securities Class Action in full.

109.    Specifically, Judge Coughenour cited the allegations based on the account of both CW1 and CW2 as "consistent" and "corroborating."

110.    Additionally, Judge Coughenour wrote that, "the Court can draw a reasonable inference that Zillow designed the Co-Marketing Program to allow lenders to pay more than fair market value for the advertising they received and therefore fell outside RESPA's safe harbor provision."

111.    Further, Judge Coughenour addressed the Securities Class Action allegations of false and materially misleading statement; particularly, Defendants' assurance that the Company was taking affirmative action to ensure compliance of the Co-Marketing Program. "That statement is not one of belief, but rather expresses that Zillow was taking affirmative action to ensure compliance."

112.    When addressing the defendants specifically, Judge Coughenour stated: "Phillips' statements were materially misleading for failing to disclose that the comarketing program was designed to facilitate RESPA violations and for failing to disclose that Zillow had changed the program in response to the CFPB's investigation." Judge Coughenour added: "Rascoff's statement that '[w]e think the way we've constructed the program is completely compliant and allows agents and lenders to stay within the confines of the laws that govern this,' was materially misleading because it omitted that Zillow designed the co-marketing program to allow agents and lenders to violate RESPA, and that the company was encouraging such violations."

## DERIVATIVE AND DEMAND ALLEGATIONS

113.    Plaintiffs bring this action derivatively in the right and for the benefit of Zillow to redress the breaches of fiduciary duty and other violations of law by Defendants.

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

114.     Plaintiffs will adequately and fairly represent the interests of Zillow and its shareholders in enforcing and prosecuting its rights.

115.     When this action was commenced, the Board consisted of the following eight (8) directors: Defendants Barton, Blachford, Frink, Hoag, Maffei, Rascoff, and Stephenson, and non-party Underwood.  Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

**Defendant Rascoff**

116.     The principal professional occupation of defendant Rascoff is his employment with Zillow as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  In addition, according to the Company's April 26, 2017 Proxy Statement (the "2017 Proxy") the Board has determined that Defendant Rascoff is not an independent director within the meaning of NASDAQ rules because he has a relationship that would interfere with the exercise of his independent judgment in carrying out the responsibilities of a director.  Therefore there is reason to doubt that Rascoff could respond to a shareholder demand independently.  Additionally, Rascoff is a named defendant in the Securities Class Action and has had federal securities claims sustained against him therefore is interested in the outcome of a shareholder demand.

**Defendants Frink and Barton**

117.     Defendants Frink and Barton are the Company's co-founders.  According to the 2017 Proxy, the Board has determined that Defendants Frink and Barton are not independent directors within the meaning of NASDAQ rules because they have relationships that would interfere with the exercise of their independent judgment in carrying out the responsibilities of a director.  Therefore there is reason to doubt that defendants Frink and Barton could independently respond to a shareholder demand.

**Defendants Barton, Blachford, Frink, Hoag, Maffei, Rascoff, and Stephenson**

118.     Defendants Barton, Blachford, Frink, Hoag, Maffei, Rascoff, and Stephenson each

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

signed the false and misleading 2015 10-K and 2016 10-K, which falsely represented that the Company was in compliance with all government regulations.  The 2015 10-K and 2016 10-K were found to contain false and misleading statements for pleading purposes in the Securities Class Action.  Therefore, defendants Barton, Blachford, Frink, Hoag, Maffei, Rascoff, and Stephenson each face a substantial likelihood of liability and demand is excused.

**Defendants Maffei, Blachford, and Stephenson**

119.    The Audit Committee Defendants (Maffei, Blachford, and Stephenson) each face a substantial likelihood of liability for their failure to take steps to ensure the Company's regulatory compliance.  The Audit Committee Charter specifically charges the members of the Audit Committee with ensuring the Company's compliance with legal and regulatory requirements, and the Audit Committee Defendants violated their non-exculpable duties of loyalty and good faith by failing to take adequate steps to ensure such compliance.

**Defendants Maffei and Blachford**

120.    Defendants Maffei and Blachford also served as members of the Company's Audit Committee at the time that the Company received the 2015 CID from the CFPB.  Defendants Maffei and Blachford, therefore, additionally face a substantial likelihood of liability for their failure to properly ensure that the Company was in compliance with all legal and regulatory requirements after they were specifically put on notice of potential violations in 2015.

**Defendants Barton, Rascoff, Maffei and Blachford**

121.    Defendants Barton and Rascoff, each in their individual capacity, and Defendant Maffei, through an entity that he owns and controls, have invested in various private equity and venture capital funds of Technology Crossover Ventures, or TCV Funds.  Defendant Hoag is a direct or indirect director, limited partner, or member of the general partners of the TCV Funds. Defendant Blachford serves as a venture partner of Technology Crossover Ventures. Defendant Hoag co-founded Technology Crossover Ventures, a private equity and venture capital firm, in 1995 and continues to serve as a Founding General Partner.  Accordingly, there is reason to doubt

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 32-

*BADGLEY MULLINS TURNER* PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

the independence of Barton, Rascoff, Maffei, and Blachford.

**Defendant Stephenson**

122. Defendant Stephenson participates in Zillow Group's Premier Agent program, and Defendant Stephenson is the Managing Broker of Real Property Associates, which provides certain brokerage and rental management services to Defendant Rascoff. Accordingly there is reason to doubt that Stephenson is independent of Defendant Rascoff, a demonstrably interested director.

123. By virtue of these business entanglements, the Board's own admissions with respect to certain directors' independence, as well as the substantial likelihood of liability faced by a majority of the Board, demand is excused.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING INACCURATE INFORMATION

124. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

125. As alleged in detail herein, each of the Defendants had a duty to ensure that Zillow disseminated accurate, truthful and complete information to its shareholders.

126. Defendants violated their fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to Zillow shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

127. As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 33-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

## COUNT II

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

128.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

129.    As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure the Company's compliance with legal and regulatory requirements, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

130.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III

### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

131.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

132.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Zillow.

133.    Plaintiffs, as shareholders and representatives of Zillow, seek restitution from Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 34-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

B.      Directing Zillow to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to Zillow restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED this 8th day of July 2019.

**BADGLEY MULLINS TURNER PLLC**

By: */s/ Duncan C. Turner*
Duncan C. Turner, WSBA No. 20597
19929 Ballinger Way NE, STE 200
Seattle, WA 98155
Telephone: (206) 621-6566
Facsimile: (206) 621-9686
Email:  duncanturner@badgleymullins.com

*Liaison Counsel*

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna (admitted *pro hac vice*)
Gregory M. Egleston (*pro hac vice* forthcoming)
440 Park Ave. South, 5th Floor
New York, NY 10016

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 35-

Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Ave.
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062
Email: rw@weiserlawfirm.com
Email: bds@weiserlawfirm.com
Email: jmf@weiserlawfirm.com

*Co-Lead Counsel*

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT
(FILED UNDER SEAL) - 36-

**BADGLEY MULLINS TURNER** PLLC

19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686